IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CRISTIAN FLORES ROMERO, et al., )
)
      Petitioners, )
)
   v. )   No. 1:17-cv-754 (LMB/JFA)
)
YVONNE EVANS, et al., )
)
      Respondents. )

## MEMORANDUM OPINION

Before the Court are petitioners' Motion for Summary Judgment [Dkt. No. 24] and

respondents' Motion to Dismiss in Part [Dkt. No. 27] and Motion for Summary Judgment [Dkt.

No. 28]. The motions have been fully briefed, oral argument has been heard, and for the reasons

discussed in this Memorandum Opinion, respondents' Motion to Dismiss in Part will be granted

and petitioner Maria Angelica Guzman Chavez will be dismissed from this civil action. In

addition, respondents' Motion for Summary Judgment will be denied, petitioners' Motion for

Summary Judgment will be granted, and respondents will be directed to provide petitioners with

individualized bond hearings.

## I.   BACKGROUND

Petitioners Maria Angelica Guzman Chavez ("Guzman Chavez"), Jose Alfonso Serrano

Colocho ("Serrano Colocho"), Danis Faustino Castro Castro ("Castro Castro"), and Cristian

Flores Romero ("Flores Romero") (collectively, "petitioners")[1] are currently detained under the

authority of respondents Mary Yvonne Evans ("Evans"), the Field Office Director of the

---

[1] When this habeas petition was filed, there was an additional petitioner, Wilber Rodriguez
Zometa. On September 21, 2017, he voluntarily dismissed his claims. See Dkt. No. 33. In
addition, the amended habeas petition contained three counts. On August 25, 2017, petitioners
dismissed Count 3. See Dkt. No. 26.

Washington Field Office of Enforcement and Removal Operations, United States Immigration and Customs Enforcement ("ICE"); Thomas D. Homan ("Homan"), the Acting Director of ICE; Brenda Cook ("Cook"), the Court Administrator of the Executive Office for Immigration Review ("EOIR"), Baltimore Immigration Court; and Jefferson B. Sessions III ("Sessions"), the Attorney General of the United States (collectively, "respondents").[2] In this action, petitioners seek a writ of habeas corpus (Count 1) and a declaratory judgment (Count 2) stating that petitioners are detained under 8 U.S.C. § 1226(a), not 8 U.S.C. § 1231, and ordering respondents to either release petitioners or grant them bond hearings, along with miscellaneous associated relief.[3]

The material facts in this action are clear and uncontroverted. All four petitioners are natives and citizens of either Guatemala or El Salvador. See Resp. Mem. [Dkt. No. 29] Ex. 1, at 2; id. Ex. 3, at 2; id. Ex. 4, at 2; id. Ex. 5, at 1, 4. At various times between 1999 and 2013, all four entered or attempted to enter the United States without being admitted by an immigration officer. Id. Ex. 1, at 2; id. Ex. 3, at 2; id. Ex. 4, at 2; id. Ex. 5, at 3, 6. All were arrested and placed in removal proceedings, ordered removed, and removed to their native countries. Id. Ex. 1, at 2; id. Ex. 3, at 2; id. Ex. 4, at 2; id. Ex. 5, at 5, 6. After removal, all four reentered the United States without receiving permission from the appropriate authorities, and their removal orders were reinstated. Id. Ex. 1, at 2-3; id. Ex. 3, at 3; id. Ex. 4, at 2-3; id. Ex. 5, at 7.[4] Each petitioner expressed a fear of removal back to his or her home country and was referred to a United States Citizenship and Immigration Services ("USCIS") officer for a reasonable fear

---

[2] All respondents are sued in their official capacities.

[3] Petitioners purport to represent a class of detained individuals but have not yet filed for class certification. As such, their claims will be discussed as individual claims.

[4] Alone among petitioners, Guzman Chavez has reentered the United States without authorization twice. In 2012, after her initial removal, she reentered the country, her removal order was reinstated, she pled guilty to a criminal charge of illegal reentry, and she was removed. See Resp. Mem. Ex. 5, at 5, 13. This additional reentry is not relevant to the legal arguments in this action.

interview. Id. Ex. 1, at 3; id. Ex. 3, at 3; id. Ex. 4, at 2-3; id. Ex. 5, at 7. In each case, the USCIS

asylum officer determined that the petitioner expressed a reasonable fear of persecution or

torture and referred the matter to the Immigration Court, which is conducting withholding-only

proceedings. Id. Ex. 1, at 3-4; id. Ex. 3, at 3; id. Ex. 4, at 2-3; id. Ex. 5, at 7, 9-10. Each petitioner

remains detained pending resolution of those proceedings. Id. Ex. 1, at 3-4; id. Ex. 3, at 3; id. Ex.

4, at 2-3; id. Ex. 5, at 7.[5]

Flores Romero originally brought a petition for a writ of habeas corpus under 28 U.S.C. §

2241, naming Evans and the EOIR as respondents. [Dkt. No. 1], but later filed an amended

petition adding the other petitioners and new respondents, dropping the EOIR as a respondent,

and including class action claims [Dkt. No. 5]. The core argument in the habeas petition is that

petitioners are detained under 28 U.S.C. § 1226(a) and, as such, are entitled to bond hearings.

## II.    DISCUSSION

### A.  <u>**Standard of Review**</u>

A party is entitled to summary judgment if the party can show "that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 249 (1986). In general, bare allegations or assertions by the nonmoving party are not

sufficient to generate a genuine dispute; instead, the nonmoving party must produce

"significantly probative" evidence to avoid summary judgment. Abcor Corp. v. AM Int'l, Inc.,

916 F.2d 924, 929-30 (4th Cir. 1990) (quoting Anderson, 477 U.S. at 242). That being said, in

---

[5] Flores Romero, Serrano Colocho, Castro Castro, and Guzman Chavez have been detained by
ICE respectively since October 5, 2016, Resp. Mem. Ex. 1, at 3; July 5, 2017, id. Ex. 3, at 3;
May 19, 2017, id. Ex. 4, at 3; and July 24, 2017, id. Ex. 5, at 8, 11.

3

ruling on a motion for summary judgment, a court should accept the evidence of the nonmovant, and all justifiable inferences must be drawn in her favor. Anderson, 477 U.S. at 255.

### B. <u>Motion to Dismiss in Part for Lack of Jurisdiction</u>

Respondents first argue that Guzman Chavez's claims should be dismissed for lack of jurisdiction. Resp. Mem. 13-14. According to respondents, in general the "proper respondent for a writ of habeas corpus" is the "immediate custodian" of the petitioner—the "warden of the facility where the petitioner is confined." Id. at 13 (citing Rumsfeld v. Padilla, 542 U.S. 426 (2004)). Unlike the other petitioners, Guzman Chavez was detained in Florida, not in Virginia, when this action was filed; as such, respondents argue that her claims should be dismissed because the Court lacks jurisdiction over the warden of the Florida detention facility, who is the only proper respondent. Id. at 14.

In response, Guzman Chavez argues that the rule from Padilla should not be applied in the immigration context because "the individuals who can provide relief in a habeas petition to an immigrant detainee . . . [are] the Attorney General and the Director of ICE," not the warden of the detention facility where the petitioner is held. Guzman Chavez Opp. [Dkt. No. 34] 2. Guzman Chavez supports this argument by pointing to a circuit split on this question, which the Fourth Circuit has not addressed, and by emphasizing that, as a matter of law, the warden of a detention facility cannot order a bond hearing. See id. at 3-7.[6] In addition, Guzman Chavez appears to argue that any concerns that a rule allowing immigrant detainees to sue the Attorney

---

[6] Guzman Chavez also argues in a footnote, and without further elaboration, that she is "also asking for injunctive relief, which is relief for which [r]espondents are clearly proper parties and that could be provided in Virginia." Guzman Chavez Opp. 2 n.1. As respondents correctly argue, to obtain injunctive relief, Guzman Chavez first needs to identify a cause of action that gives the Court jurisdiction over her claims; if respondents are correct that her habeas petition must be brought against her immediate custodian, over whom this Court apparently does not have personal jurisdiction, there is no viable cause of action that allows her to seek injunctive relief from this Court. See Resp. Reply [Dkt. No. 36] 5 n.2.

4

General rather than the warden would incentivize forum shopping can be limited by a set of venue rules,[7] such as requiring that the action be filed in the district where the immigration proceedings are ongoing. See id. at 7-9.

As both parties recognize, the seminal case addressing who constitutes a proper habeas respondent is Padilla, which involved an American citizen detained pursuant to President Bush's determination that he was an "enemy combatant." Padilla brought a habeas petition naming as respondents President Bush, Secretary of Defense Donald Rumsfeld, and Melanie Marr ("Marr"), the Commander of the Naval Brig where Padilla was being held. See Padilla, 542 U.S. at 432. Padilla had originally been arrested in Chicago by federal agents executing a material witness warrant issued by the United States District Court for the Southern District of New York. See id. at 430-31. He was transferred to New York, where he was held on federal criminal charges for approximately one month before he was designated an enemy combatant, transferred to Department of Defense custody, and moved to a brig in Charleston, South Carolina. See id. at 431-32. After he was moved to South Carolina, Padilla filed his habeas petition in the Southern District of New York. Id. at 432. The government moved to dismiss, arguing that the court did not have jurisdiction over Marr, the immediate custodian and only proper respondent. See id. On that preliminary question, the district court held that Rumsfeld's "personal involvement" in Padilla's custody rendered him a proper respondent; the Second Circuit agreed, finding in addition that on the "unique" facts of the case, Rumsfeld's exercise of the "legal reality of control" over Padilla made him an appropriate respondent. Id. at 432-33.

---

[7] Guzman Chavez in fact uses the term "venue" repeatedly in her brief, but she does not appear to be making an argument about the actual venue statute. In Justice Kennedy's concurrence in Padilla, he conceptualized proper-respondent rules as something akin to "venue," rather than "personal jurisdiction," rules, and the Court interprets Guzman Chavez's argument as invoking this discussion.

The Supreme Court reversed the Second Circuit after finding that Marr was the only proper respondent. According to the Court, the "question whether the Southern District has jurisdiction over Padilla's habeas petition breaks down into two related subquestions. First, who is the proper respondent to that petition? And second, does the Southern District have jurisdiction over him or her?" Id. at 434. The Court addressed each question in turn.

Beginning with the first question—the proper respondent—the Court started its analysis with the text of the habeas statute, which "straightforwardly provides that the proper respondent" is "the person who has custody over" the petitioner. Id. at 434 (quoting 28 U.S.C. § 2242). The statute's "consistent use of the definite article" suggested to the Court that "there is generally only one proper respondent" for a given petitioner and that this proper respondent is the person "with the ability to produce the prisoner's body before the habeas court." Id. at 434-35. As the Court explained, this language provides the basis for the general rule that has been "confirm[ed]" by "longstanding practice": "[I]n habeas challenges to present physical confinement—'core challenges'—the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." Id. at 435.[8]

Padilla relied on three cases—Braden v. 30th Judicial Circuit Court, 410 U.S. 484 (1973); Strait v. Laird, 406 U.S. 341 (1972); and Ex parte Endo, 323 U.S. 283 (1944)—to argue that there should be an exception to this general rule that would enable prisoners who are not

---

[8] At this point, the Court included a footnote acknowledging that it had previously "left open the question whether the Attorney General is a proper respondent to a habeas petition filed by an alien detained pending deportation." Padilla, 542 U.S. at 435 n.8. The Court recognized that the lower courts had split (with the majority applying the immediate custodian rule) but, because the issue was not squarely presented in Padilla, the Court "again decline[d] to resolve it." Id. Since Padilla was decided, the availability of habeas relief to immigration detainees has been significantly curtailed and it is unclear how the pre-Padilla lower court decisions would apply to the new immigrant habeas landscape. See 8 U.S.C. § 1252;

detained under criminal charges to sue the individual with legal, rather than physical, control over the prisoner. The Court rejected that reliance by pointing out that the petitioners in Braden and Strait were not challenging their immediate physical custody; therefore, "the immediate custodian rule did not apply because there was no immediate physical custodian with respect to the 'custody' being challenged." Padilla, 542 U.S. at 439.[9] Moreover, the Court determined Endo to be inapplicable, as it read that case to stand for "the important but limited proposition" that if the government moves a habeas petitioner after the petition is properly filed, the district court retains jurisdiction over the petition. Id. at 441. The Court held that none of those cases established a broad exception to the general rule governing habeas petitions that, like Padilla's, challenged the petitioner's present physical confinement. Id. at 441-42.

Having determined that Marr was the proper respondent, the Padilla Court moved on to the second question: whether the district court had jurisdiction over Marr. See id. at 442.[10] The Court first observed that the longstanding interpretation of habeas jurisdiction was that jurisdiction was available only in the district of confinement, an interpretation supported by various provisions of the habeas statutes and implicitly confirmed by Congress. See id. at 442-43. Then, the Court rejected Padilla's argument that Braden and Strait stand for the proposition that "jurisdiction will lie in any district in which the respondent is amenable to service of process." Id. at 443. As the Court explained, the Braden petitioner, who was detained in

---

[9] In Braden, the petitioner, who was in custody in Alabama, brought a habeas corpus proceeding against a Kentucky court where he had a separate indictment pending, arguing that he had a right to a speedy trial on the Kentucky indictment. 410 U.S. at 485-86. In Strait, the petitioner, who was an Army Reserve officer, brought a habeas corpus proceeding in which he requested a discharge as a conscientious objector against the commanding officer of the Army records center. 406 U.S. at 342.

[10] This requirement comes not from notions of personal jurisdiction but from 28 U.S.C. § 2241(a), which limits district courts to granting habeas relief "within their respective jurisdictions."

7

Alabama, was challenging his future confinement in Kentucky and he sued the future custodian in the Western District of Kentucky, where that custodian was located. Id. at 444-45. The Court held that the Western District had jurisdiction because the custodian was properly served "in that district." Id. at 445 (quoting Braden, 410 U.S. at 500). According to the Padilla Court, this decision "does not derogate from the traditional district of confinement rule for core habeas petitions challenging present physical custody" and, in fact, Braden cites favorably to a case "squarely holding that the custodian's absence from the territorial jurisdiction of the district court is fatal to habeas jurisdiction." Id. at 445.

In Strait, the petitioner was an Army reserve officer who was physically located in California. Id. He brought a habeas action against the commanding officer of the Army records center, who was located in Indiana, asking the court to require the Army to process his discharge as a conscientious objector. Id. The respondent objected to the filing of the action in California, as he was not physically present in that state. See id. As the Padilla Court explained, the Strait Court was confined by the then-existing Ahrens rule, which "required that both the petitioner and his custodian be present" in the district of suit. Id. at 446. To fit Strait's habeas petition into the confines of this rule, the Strait Court "invoke[d] concepts of personal jurisdiction to hold that the custodian was 'present' in California through the actions of his agents." Id. Because the Padilla Court had already held that Marr was the proper respondent and both Marr and Padilla were physically present in South Carolina, the Court found "no occasion" to engage in designation of nominal custodians or other such work-arounds. Id.

Therefore, the Court held that the "proviso that district courts may issue the writ only 'within their respective jurisdictions' forms an important corollary to the immediate custodian rule in challenges to present physical custody under § 2241" and the two rules together

"compose a simple rule": "Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement." Id. at 447.

Although Padilla has some initial force, ultimately it fails to account for a key difference between this action and Padilla. In Padilla, the petitioner was challenging his physical detention. Although the Secretary of Defense exercised legal control over that detention and would have been able to order Padilla's release, the commander of the brig where Padilla was held also exercised control over his detention and could release him. Therefore, the Padilla Court's holding is more properly viewed as applying to situations where there are multiple officials— some lower-level, such as the warden, and some higher-level, such as the Secretary of Defense— in the chain of custody, all of whom have the capacity to order the requested relief: the release of the prisoner. In such a context, Padilla holds that the petitioner cannot have his pick of officials to sue; instead, he must sue his immediate custodian.

The present action does not fit into this context. Although there are a variety of officials—including the Attorney General and the warden of the Florida facility—who could order Guzman Chavez's release, she is not actually seeking release. Instead, she is seeking an individualized bond hearing, relief which the warden is unable to provide. Therefore, forcing her to sue the warden would be an act of futility. Even if she won a judgment requiring that a bond hearing be held, the warden would not have any ability to provide the relief obtained. Guzman Chavez Opp. 4. The more logical rule is that an immigrant habeas petitioner must sue the warden if and only if the warden can provide the requested relief. If the warden is unable to provide the

relief, the immigrant detainee may name as respondent any official who is legally authorized to provide the relief requested.[11]

In addition to conforming to the underlying logic of Padilla, this result accords with the conclusion reached by the one in-circuit district court opinion to have fully considered the question. See Jarpa v. Mumford, 211 F. Supp. 3d 706 (D. Md. 2016) (Xinis, J.), appeal filed, No. 16-7665 (4th Cir. Dec. 2, 2016). In Jarpa, the petitioner named as respondents both the warden of the facility where he was detained as well as various higher-level officials, including the Secretary of Homeland Security and the Attorney General. Id. at 708. The government moved to dismiss all of the respondents except the warden, citing the immediate custodian rule. Id. at 723. The court declined to apply the immediate custodian rule and dismiss the higher-level officials because "the relief sought can only practically be delivered by the head of the agency in charge of interpreting and executing the immigration laws," id. at 724; however, because the petitioner sued the warden along with the higher-level officials, the court did not have to decide whether a petitioner can properly name only higher-level officials and not the appropriate warden.[12]

The second question identified in Padilla—whether the Court has jurisdiction over the appropriate respondent(s)—involves determining whether the court should use traditional

---

[11] Respondents appear at times to incorrectly characterize this as a "core" habeas case where Guzman Chavez is challenging her "present physical confinement." Resp. Reply 3-4. So characterized, Guzman Chavez's petition seems bound by the "default rule" announced in Padilla. But in reality, Guzman Chavez is not challenging her present physical confinement; instead, she is challenging the decision to confine her without giving her access to an individualized bond determination. Characterized in this more precise way, Guzman Chavez's petition avoids the default Padilla rule and allows her to name as respondents the officials who can actually provide her a bond hearing.

[12] The briefing in Jarpa has been stayed pending the Supreme Court's resolution of Jennings v. Rodriguez, No. 15-1204, in which detained aliens are arguing that the Constitution requires that aliens subject to mandatory detention under the Immigration and Nationality Act ("INA") receive bond hearings if their detention reaches six months. Unlike petitioners in the present action, the Jarpa petitioner included a due process claim that may be resolved by the Supreme Court's decision in Jennings. See 211 F. Supp. 3d at 710.

"service of process" principles to analyze jurisdiction or whether, as in <u>Padilla</u>, a more limited locational analysis is appropriate. If the former, the Court has jurisdiction over respondents. If the latter, the Court likely does not have jurisdiction over respondents, as neither Guzman Chavez nor any proper respondent is apparently located in this district.[13] Based on the principles laid out in <u>Padilla</u>, a locational analysis is appropriate: the <u>Padilla</u> Court explicitly rejected the "service of process" test and all of the cases it cites involved petitions filed in districts with some locational nexus to the petitioner or a respondent. The hard question presented in some of those cases arises when the proper respondent and the petitioner are located in different districts, as in <u>Braden</u> and <u>Strait</u>; however, even in those cases, the courts have limited themselves to finding jurisdiction appropriate either where the petitioner resides (in <u>Strait</u>) or where the respondent is located (in <u>Braden</u>). Given the historical focus on territoriality in habeas cases, as alluded to in <u>Padilla</u>, as well as the fear respondents express that an expansive rule would allow immigrant detainees to engage in forum shopping, this locational limitation is appropriate.

Therefore, in situations such as Guzman Chavez's, where an immigrant detainee requesting a bond hearing is located in a different district from the officials who have the ability to grant her a hearing, those officials are proper respondents but the detainee must file her petition either where she is located or where the officials are located. Filing a petition in a third district where neither the petitioner nor any proper respondent is located does not satisfy the limitation in the habeas statutes, which only allow courts to grant habeas petitions within their

---

[13] Guzman Chavez, who is currently detained in Florida, identifies the Attorney General and the Director of ICE as the two respondents with authority to order a bond hearing. Guzman Chavez Opp. 5-6 (citing 8 U.S.C. § 1226(a), 6 U.S.C. § 557). Respondents do not contest that position. Although the habeas petition does not identify a location for either the Attorney General or the Director of ICE, the headquarters of both ICE and the Department of Justice are located in the District of Columbia.

respective jurisdictions. As such, respondents' Motion to Dismiss in Part will be granted and petitioner Guzman Chavez's claims will be dismissed without prejudice.

## C. **Cross-Motions for Summary Judgment**

As both parties agree, all relevant facts in this action are undisputed and the resolution of the habeas petition turns on a pure question of law: whether ICE's authority to detain petitioners arises from 8 U.S.C. § 1226, as petitioners contend, or 8 U.S.C. § 1231, as respondents contend. If petitioners are held under § 1226, they are entitled to a bond hearing under § 1226(a). If petitioners are held under § 1231, they are subject to mandatory detention without a bond hearing.[14] Petitioners rely on a Second Circuit opinion holding that aliens in petitioners' position are detained under § 1226(a) and are entitled to bond hearings. Guerra v. Shanahan, 831 F.3d 59 (2d Cir. 2016). Respondents rely on Ninth Circuit and Eastern District of Virginia decisions holding that detainees in petitioners' position are detained under § 1231 and are not entitled to bond hearings. See Padilla-Ramirez v. Bible, 862 F.3d 881 (9th Cir. 2017); Crespin v. Evans, 256 F. Supp. 3d 641, No. 1:17-cv-140, 2017 WL 2385330 (E.D. Va. May 31, 2017), appeal pending, No. 17-6835 (4th Cir.).

The context of petitioners' detention and the legal claims raised by both parties involve the nature of reinstated final removal orders and the effect of withholding-only proceedings on those orders, as well as the statutes governing detention during and after removal proceedings.

---

[14] The Supreme Court has recognized a limited due process right to release from mandatory detention in certain narrow circumstances. See Zadvydas v. Davis, 533 U.S. 678 (2001). Petitioners have expressly declined to pursue a Zadvydas-based due process claim, although they have indicated that they may seek leave to amend their petition to add such a claim as the length of their detentions increase. See Pet. Reply [Dkt. No. 35] 16 n.8.

1.  Reinstated Removal Orders and Withholding-Only Proceedings

When an alien who has been ordered removed from the United States and has either been removed or departed voluntarily under the order of removal illegally reenters the country, the original order of removal "is reinstated from its original date." 8 U.S.C. § 1231(a)(5). Such an order "is not subject to being reopened or reviewed" and the alien "may not apply for any relief" under the INA. See id. In general, this provision "forecloses discretionary relief from the terms of the reinstated order," Fernandez-Vargas v. Gonzales, 548 U.S. 30, 35 (2006); however, there is one exception to this rule. Congress has provided, consistent with the United States's obligations under international law, that the Attorney General may not remove an alien to a country where the alien's life or freedom would be threatened. See 8 U.S.C. § 1231(b)(3).[15] This restriction applies even to aliens with reinstated removal orders. See id. Therefore, although an alien cannot otherwise challenge a reinstated removal order, he can seek protection from having that order executed to a particular country by initiating a withholding-only proceeding.

When an alien subject to a reinstated removal order expresses a fear of removal to the country indicated in his removal order, the Department of Homeland Security ("DHS") refers the alien to an asylum officer for a pre-withholding screening interview. See 8 C.F.R. § 208.31(b). If the asylum officer determines that the alien "has a reasonable fear of persecution or torture," the alien may apply for withholding of removal. See id. § 208.31(e).[16]

---

[15] In addition to applying for withholding of removal under the statutory provision, aliens may also apply for withholding of removal under the Convention Against Torture. The standards for withholding are slightly different under the two provisions, but the process is the same. See 8 C.F.R. § 208.16.

[16] Alternatively, if the asylum officer determines that the alien has not established a reasonable fear, the alien can appeal that decision to an immigration judge ("IJ"). Id. § 203.31(f). If the IJ agrees with the asylum officer, the process ends (there is no appeal) and DHS will execute the reinstated removal order. Id. § 203.31(g)(1). If, on the other hand, the IJ finds the alien has

If the alien passes this screening process, then the alien is permitted to apply for withholding or deferral[17] of removal and the application goes to an IJ for an initial review to determine whether the alien has met his burden.[18] Should the burden be met, the IJ will grant the alien's request for deferral or withholding of removal; however, if the IJ determines that the alien has not met his burden, the alien may appeal that determination to the Board of Immigration Appeals ("BIA") and, ultimately, to a federal court of appeals. In these "withholding-only" proceedings, the only issue is whether the alien is entitled to withholding or deferral of removal; the alien may not collaterally attack the underlying removal order. See id. §208.2(c)(3)(i).

In this litigation, each petitioner has passed the initial screening process, has applied for withholding of removal, and is in the process of applying to an IJ for an initial review of whether withholding or deferral of removal should be granted or, in the case of Flores Romero, is appealing the IJ's adverse initial determination.

## 2. Statutes Governing Alien Detention

There are two separate provisions in the INA that give the government authority to detain aliens during removal proceedings or while awaiting the execution of an order of removal. When an alien is first arrested, he or she is detained under 8 U.S.C. § 1226(a), which allows DHS to "arrest[] and detain[]" the person "pending a decision on whether the alien is to be removed from

---

established a reasonable fear of persecution or torture, then the alien may apply for withholding of removal. Id. § 203.31(g)(2).

[17] Under § 1231(b)(3), an alien applies for "withholding" of removal. Under the Convention Against Torture, an alien applies for "withholding or deferral" of removal. The difference is not relevant to this action.

[18] Under § 1231(b)(3), the alien bears the burden of establishing that "his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.16(b). To quality for protection under the Convention Against Torture, the alien bears the burden of showing it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." Id. § 208.16(c).

the United States." Under this section, the alien may be released on bond; however, once the "removal period" begins, the authority for detention shifts to 8 U.S.C. § 1231. The "removal period," which is typically a 90-day period[19] in which the alien ought to be removed, begins on the latest of three dates: (1) the "date the order of removal becomes administratively final"; (2) the "date of the court's final order" if "the removal order is judicially reviewed" and "a court orders a stay of the removal of the alien"; or (3) the "date the alien is released from detention or confinement" if "the alien is detained or confined (except under an immigration process)." Id. § 1231(a)(1)(B). During the "removal period," DHS "shall detain the alien." Id. § 1231(a)(2).

### 3. Regulations Addressing Detention

Respondents argue that DHS regulations, which deserve deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984),[20] provide that aliens in petitioners' position are detained under § 1231. Respondents primarily argue two points here. First, they contend that because under 8 C.F.R. § 241.8(e), a removal order is reinstated before the withholding-only proceedings begin, individuals in petitioners' position are subject to a final removal order. Resp. Mem. 25. Second, they argue that § 241.8(f) states that "[e]xecution of the

---

[19] There are some circumstances in which the removal period may be extended beyond 90 days. At a certain point after these 90 days, due process protections may require a bond hearing or the release of the alien. Cf. Zadvydas, 533 U.S. 678. To implement these protections, DHS has instituted regulations governing post-removal-order custody reviews. See 8 C.F.R. § 241.4. These regulations are not at issue in this action.

[20] Respondents also make a brief reference to Auer v. Robbins, 519 U.S. 452 (1997). Resp. Reply 18. To the extent respondents are arguing that their interpretation of these regulations should be given deference under Auer, their argument is rejected. See Guerra, 831 F.3d at 64 ("An agency may not convert an issue of statutory interpretation into one of deference to an agency's interpretation of its own regulations simply by pointing to the existence of regulations whose relevance is tenuous at best.").

reinstated order of removal and detention of the alien shall be administered in accordance with this part" and that Part 241 clearly lines up with § 1231. Id. at 25-26.[21]

These regulations do not answer the question raised by petitioners, see Padilla-Ramirez, 862 F.3d at 885; Guerra, 831 F.3d at 63; Crespin, 2017 WL 2385330, at *6 n.17, because it is not clear from the regulations whether § 241.8(f) even applies to individuals who have applied for withholding of removal. The immediately prior subsection, § 241.8(e), provides an "[e]xception" for such individuals by directing that aliens who express a fear of removal should be "immediately referred to an asylum officer for an interview to determine whether the alien has a reasonable fear of persecution or torture pursuant to § 208.31 of this chapter." Therefore, to the extent that respondents believe the process of detention and removal proceeds sequentially through the chapters, § 241.8(e) provides a detour out of Part 241 for individuals in withholding-only proceedings. Moreover, the only sections in Part 241 that even discuss detention are § 241.3-.4. Section 241.3 provides that "[o]nce the removal period . . . begins, an alien in the United States will be taken into custody pursuant to the warrant of removal," while § 241.4 provides for detention of certain aliens "beyond the removal period." Application of both of these sections would "beg the very question[] at issue," Padilla-Ramirez, 862 F.3d at 885: whether aliens in withholding-only proceedings are in the "removal period." Therefore, in the absence of more specific regulations clarifying the meaning of "removal period" and the effect of

---

[21] Respondents also state, without further elaboration: "[T]he regulation at § 241.4(b)(3) provides that even an alien who is granted withholding of removal is subject to the final-removal-order detention provisions of § 1231(a)(6)." Resp. Mem. 26. Although respondents do not construct a full argument from this provision, it is worth noting that § 241.4(b)(3) only provides that individuals granted withholding of removal "who are otherwise subject to detention are subject to the provisions of this part." Even assuming that being "subject to the provisions of this part" means these individuals may continue to be detained under § 1231, the regulation is inapposite because it only applies to individuals who are "otherwise subject to detention" (for example, criminal aliens).

withholding-only proceedings on the removal period, respondents' position cannot be given deference under Chevron.

### 4. The Source of Authority to Detain Petitioners

The legal question presented by petitioners boils down to a deceptively simple question: Are petitioners detained under 8 U.S.C. § 1226(a) or under 8 U.S.C. § 1231?[22] Both parties employ a variety of statutory interpretation techniques to answer this question. In the end, although respondents' arguments have some force, the text, structure, and intent of the INA compel the conclusion that petitioners are detained under 8 U.S.C. § 1226(a).

Beginning with the statutory text, § 1226(a) governs detention for an alien "detained pending a decision on whether the alien is to be removed from the United States." As an initial matter, this text governs petitioners' detention because until withholding-only proceedings are complete, a decision has not been made on whether they will in fact be removed from the United States. See Pet. Mem. [Dkt. No. 20] 10-11. As petitioners argue, § 1226(a) focuses not on a determination of removability (which has already been made) but instead on a more concrete determination of whether petitioners will actually be removed—a determination that has not yet been made in petitioners' cases. See id. As such, until the government determines that there is a country to which petitioners can legally be removed, the decision on whether they are "to be removed" remains "pending," and § 1226(a) governs their detention.

---

[22] Respondents appear to believe that the relevant question in this case is simply whether petitioners' removal orders are "administratively final"; if so, then the "removal period" has begun under § 1231 and petitioners are detained under that section. See Resp. Reply 5; see also Padilla-Ramirez, 862 F.3d at 884 ("The question before us, then, is whether Padilla-Ramirez's reinstated removal order is administratively final."). Although administrative finality is the relevant dividing line in § 1231, the Court must analyze both § 1226 and § 1231 and attempt to harmonize the two statutes rather than unduly focusing on the § 1231 provisions.

This conclusion is reinforced by the statutory structure of the INA and evidence of Congress's intent. Section 1231 provides that the removal period will begin on the latest of three dates: the date the removal order becomes final, the date any judicial stay stopping removal is lifted, or the date the alien is released from non-immigration detention. 8 U.S.C. § 1231(a)(1)(B). As petitioners explain, each of these three preconditions simply relates to a different legal impediment to actual removal: either DHS has not completed its own removal process (the order is not final) or the judicial branch has deprived DHS of authority to execute the removal process (a judicial stay stopping removal is in place) or the criminal authorities, rather than ICE, have custody of the individual and ICE does not have jurisdiction to remove the noncitizen (the alien is in non-immigration detention). In each situation, DHS may have already determined that the noncitizen is, like petitioners here, removable, but ICE lacks the present and final legal authority to actually execute that order of removal.

Moreover, Congress clearly intended to have § 1231 govern only the final logistical period, in which the government has actual authority to remove the alien and need only schedule and execute the deportation. Congress has specifically limited the normal "removal period" to 90 days, a limitation that makes sense if the removal period is only meant to govern the final logistical steps of physically removing an alien. Based on the length of petitioners' detentions to date, it is obvious that withholding-only proceedings take substantially longer than 90 days. As such, it would be contrary to congressional intent to shoehorn a class of aliens whose proceedings will typically far exceed 90 days into the "removal period" for which Congress has specifically intended a 90-day limit.

Background legal principles of finality also support petitioners' view. The INA limits judicial review to a "final order of removal," 8 U.S.C. §1252(a)(1), and aliens may appeal

adverse decisions in withholding-only proceedings only "as part of the review of a final order of removal," id. § 1231 note (d). Addressing these statutes, many courts have held that a reinstated removal order is not final for purposes of judicial review until after the adjudication of any withholding applications, an interpretation the government has itself endorsed. See Pet. Mem. 16 (collecting cases).[23] It would be nonsensical to adopt a "bifurcated definition of finality" with respect to removal orders in withholding-only proceedings. Guerra, 831 F.3d at 63. As such, the Court must conclude that reinstated removal orders do not become "administratively final" for purposes of § 1231 until they are final for purposes of appellate review.

Moving beyond the INA context, principles of administrative law support the conclusion that a reinstated removal order is not final until after the conclusion of any withholding-only proceedings. See Pet. Mem. 17. In agency law, finality is generally achieved when an action both "mark[s] the consummation of the agency's decisionmaking process" and also determines legal rights or obligations. Id. at 18 (quoting Bennett v. Spear, 520 U.S. 154, 177 (1997)). In this case, although some legal rights or obligations have already been determined (the petitioners are removable), the decisionmaking process is ongoing—i.e., it has not been consummated—as the agency is still determining whether petitioners will be granted withholding of removal or will be removed. See id. As such, under principles of administrative law, petitioners' removal orders are not "final"; therefore, petitioners are being detained under § 1226(a).

Respondents' arguments to the contrary are unavailing. First, they argue that the text of § 1226(a) supports their position because petitioners' removal orders have already been

---

[23] Respondents argue that the Fourth Circuit has held that a reinstated removal order's date of finality is the date of the original entry of the order of removal, Resp. Reply 17 (citing Mejia, 866 F.3d 573); however, that case involved the date of finality for determining whether a challenge to the underlying removal order was timely. It is not clear how the Fourth Circuit would analyze finality dates in the context of a challenge to the eventual withholding-only proceedings.

reinstated; as such, the decision on whether petitioners are "to be removed" is no longer

"pending." Resp. Mem. 16-17. In addition, they argue that there is no legal requirement that they

amend the final removal order if they wish to remove petitioners to a third country. Id. at 20.

Therefore, because respondents may "immediately remove" petitioners "to a third country based

on their reinstated orders without" any "additional proceedings, the reinstated removal orders

must necessarily be final." Id. This reasoning is incomplete. Although DHS may eventually be

able to remove petitioners to some third country even if their application for withholding of

removal is granted, third-country removal would require additional proceedings. At the least,

DHS would be required to give petitioners notice and the opportunity for a hearing. Pet. Mem.

12.[24] Moreover, the provision allowing for the removal of detainees to additional countries, 8

U.S.C. § 1231(b)(2), places "sharp limitations on the countries" that the government may

designate for removal—and respondents have not shown that there are any countries that meet

those limitations for petitioners. Pet. Reply 5. Finally, as a practical matter, the United States of

America generally cannot simply sua sponte deport an alien to a country where he or she does

not have citizenship; instead, the government must typically get permission to deport from the

third country. Cf. Zadvydas, 533 U.S. at 684 (explaining that the government could not deport

the petitioner to Germany, Lithuania, or the Dominican Republic despite his ties to those

---

[24] The parties argue about whether the government can deport an alien to a third country without
amending the removal order and whether an IJ who grants withholding of removal has the
authority to alter the actual underlying removal order. See Pet. Mem. 12; Resp. Mem. 19-20;
Resp. Reply 9-12. Respondents are correct that an IJ in withholding-only proceedings does not
have the authority to amend the underlying removal order, see 8 U.S.C. § 1231(a)(5); In re Balbi,
2006 WL 3203536 (BIA Oct. 2, 2006), and that the government has the ability to deport an alien
in withholding-only proceedings to a country not specified in the removal order, see 8 C.F.R.
§ 1240.12(d). At the same time, petitioners are correct that DHS could not immediately remove
petitioners to a third country, as DHS would first need to give petitioners notice and the
opportunity to raise any reasonable fear claims. Cf. Kossov v. INS, 132 F.3d 405, 408-09 (7th
Cir. 1998).

countries because those countries would not accept him). As such, it is not clear at the present time that petitioners are in fact "to be removed" from the United States. All that is clear is that they are removable.

Turning to the text of § 1231(a)(5), respondents argue that the provision makes clear that the removal period has begun for petitioners. Because a reinstated removal order "is not subject to being reopened or reviewed," respondents argue that petitioners' removal orders are "administratively final" and petitioners are detained under § 1231. Resp. Mem. 14. This argument is unpersuasive. Although the INA indicates that reinstated removal orders are final in the ordinary case, other regulatory provisions that bear more closely on withholding-only proceedings emphasize that aliens in these proceeds are situated differently from the ordinary alien subject to a reinstated removal order. For example, as discussed above, 8 C.F.R. § 241.8(e) provides an "[e]xception" to the reinstatement-of-removal regulations when an alien applies for withholding of removal. In addition, the text of § 1231(a)(5) does not squarely answer the question presented. Indeed, § 1231(a)(5) does not even mention withholding-only proceedings, much less does it speak clearly to the source of the authority to detain individuals in those proceedings.

Respondents emphasize that the INA dictates that an order of deportation "shall become final" once the BIA affirms it or the time for seeking BIA review of the order runs out. 8 U.S.C. § 1101(a)(47)(B); see Resp. Reply 6. They go on to argue that because petitioners cannot seek BIA review of their underlying removal order, the order is administratively final. This argument is not especially persuasive. As even respondents recognize, finality may have different meanings in different contexts. The INA definition respondents point to defines "final," but § 1231(a)(5) speaks of orders that are "administratively final." The addition of the modifier

21

"administratively" indicates that Congress intended for finality in the § 1231(a)(5) context to mean something different from finality in the normal § 1101(a)(47)(B) context. If Congress intended for the meanings of the two provisions to be the same, it presumably would have used the same unqualified word "final."

## III.   CONCLUSION

All told, this petition presents a difficult question of statutory interpretation. Although respondents' arguments have some merit, petitioners' position, which attempts to harmonize § 1226 and § 1231 by locating the dividing line between the two sections as the moment when the government has final legal authority to remove the alien, better accords with the text, structure, and intent of the relevant provisions. Accordingly, the Court concludes that petitioners are detained under § 1226(a), not § 1231, and therefore are entitled to individualized bond hearings.

For the reasons stated above, respondents' Motion to Dismiss in Part will be granted, petitioners' Motion for Summary Judgment will be granted, and respondents' Motion for Summary Judgment will be denied by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 17th day of November, 2017.

/s/

Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

22